No. 21-4563

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

### UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

**v.**

### CLAUDIO ALVAREZ RODRIGUEZ,
*Defendant/Appellant*.

---

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Anthony J. Trenga)**

---

**BRIEF OF THE APPELLANT**

---

                                           **GEREMY C. KAMENS**
                                           **Federal Public Defender**

                                           **Patrick L. Bryant**
                                           **Appellate Attorney**
                                           **Cadence A. Mertz**

**Julie K. Linnen**                            **Assistant Federal Public Defender**
**Assistant Federal Public Defender**     **1650 King Street, Suite 500**
**150 Boush Street, Suite 403**             **Alexandria, VA 22314**
**Norfolk, VA 23510**                    **(703) 600-0800**
**(757) 457-0800**                       **Patrick_Bryant@fd.org**
**Julie_Linnen@fd.org**                 **Cadence_Mertz@fd.org**

*Counsel for Appellant*

# **TABLE OF CONTENTS**

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Mr. Alvarez Rodriguez establishes a life in the United States, but is indicted for illegal reentry.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Mr. Alvarez Rodriguez files a motion to dismiss the indictment on constitutional grounds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    After the district court denies the motion, Mr. Alvarez Rodriguez enters a conditional guilty plea and is sentenced to time served. . . . . 7

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    The Illegal Reentry Statute, 8 U.S.C. § 1326, Violates the Equal Protection Guarantee of the Fifth Amendment. . . . . . . . . . . . . . . . . . . . 10

    I.    The *Arlington Heights* framework applies in this case, not rational basis review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    *Arlington Heights* applies to race-based challenges. . . . . . . . 12

        B.    As a criminal law, § 1326 should not receive the deference given to immigration laws. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

C.    *Arlington Heights* can still apply to immigration laws. . . . . . 19

II.    Under the *Arlington Heights* framework, § 1326 is uncon-
stitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.    *Arlington Heights* creates a burden-shifting framework
with a low threshold for challengers to meet. . . . . . . . . . . . . 22

B.    Congress enacted the illegal reentry statute with a dis-
criminatory purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1.    "The historical background of the decision". . . . . . . . 26

2.    "The specific sequence of events leading to the
challenged action". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3.    "The relevant legislative or administrative history". . . 32

4.    "The legislature's departures from normal
procedures of substantive conclusions". . . . . . . . . . . . 35

5.    "The impact of the official action and whether it
bears more heavily on one race than another". . . . . . . 37

6.    The government has not met its burden. . . . . . . . . . . . 39

III.    The 1952 reenactment did not address the racist origins of § 1326
and was also motivated by discriminatory intent. . . . . . . . . . . . . . . 42

A.    Subsequent reenactments did not erase the racial animus
that motivated the 1929 law. . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.    The 1952 enactment was also motivated by discriminatory
intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*, 138 S. Ct. 2305 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 47

*Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187 (1912). . . . . . . . . . . . . . . . . . . . 44

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015).. . . . . . . . . . . . . . . . . . . . 13, 34, 38

*Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493 (9th Cir. 2016)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 35, 38

*California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994 (N.D. Cal.
2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018). . . . . . . . 15

*City of S. Miami v. DeSantis*, No. 19-cv-22927, 2021 WL 4272017 (S.D. Fla.
Sept. 21, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cook Cnty., Illinois v. Wolf*, 461 F. Supp. 3d 779 (N.D. Ill. 2020). . . . . . . . . . . . 15

*Democratic National Committee v. Hobbs*, 948 F.3d 989 (9th Cir. 2020).. . . . . . . 34

*Dent v. Sessions*, 900 F.3d 1075 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891
(2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19, 21

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). . . . . . . . . . . 45, 47

*FCC v. Beach Comm's, Inc.*, 508 U.S. 307 (1993). . . . . . . . . . . . . . . . . . . . . . . 16

*Fiallo v. Bell*, 430 U.S. 787 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957). . . . . . . . . . 43

*Heller v. Doe*, 509 U.S. 312 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hunt v. Cromartie*, 526 U.S. 541 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 30

*Hunter v. Underwood*, 471 U.S. 222 (1985). . . . . . . . . . . . . . . . . 12, 23, 34, 43, 46

*I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984).. . . . . . . . . . . . . . . . . . . . . . 16, 18

*Keene Corp. v. United States*, 508 U.S. 200 (1993). . . . . . . . . . . . . . . . . . . . . . . . 43

*Kleindeinst v. Mandel*, 408 U.S. 753 (1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*La Clinica de la Raza v. Trump*, __ F. Supp. 3d __, 2020 WL 6940934 (N.D.
Cal. Nov. 25, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Loving v. Virginia*, 388 U.S. 1 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir.
2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 34, 38

*Ortiz v. United States*, 138 S. Ct. 2165 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Othi v. Holder*, 734 F.3d 259 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). . . . . . . . . . . . . . . . . . 25, 44, 45, 47

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018). . . . . . . . . . . . . . . . . 15

*Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476
(9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 19

*Sesay v. United States*, 984 F.3d 312 (4th Cir. 2021). . . . . . . . . . . . . . . . . . . . 19-20

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017). . . . . . . . . . . . . . . . . . . . . . 10

iv

*The Committee Concerning Community Improvement v. City of Modesto*, 583
F.3d 690, 704 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Barcenas-Rumualdo*, ___ F.4th ___, No. 21-50795, 2022 WL
17072285, at *4 (5th Cir. Nov. 18, 2022). . . . . . . . . . . . . . . . . . . . . . . . 25, 40

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012). . . . . . . . . . . . . . . . . 26

*United States v. Carillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021). . . . . . *passim*

*United States v. Guzman-Velasquez*, 919 F.3d 841 (4th Cir. 2019). . . . . . . . . . . . 10

*United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774 (S.D.
Tex. Feb. 2, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Machic-Xiap*, 552 F. Supp. 3d 1055 (D. Or. 2021). . . . . . . *passim*

*United States v. Mendoza-Lopez*, 481 U.S. 828, 835 (1987). . . . . . . . . . . . . . . . 47

*United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) (en banc). . . 12

*United States v. Munoz-de la O*, No. 2:20-cr-134-RMP-1, 2022 WL 508892
(E.D. Wash. Feb. 18, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Palacios-Arias*, No. 3:20-cr-62 (E.D. Va. Oct. 13, 2020)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 42

*United States v. Palacios-Arias*, No. 21-4020, 2022 WL 1172167 (4th Cir.
Apr. 20, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Rios-Montano*, No. 19-cr-2123, 2020 WL 7226441 (S.D. Cal.
Dec. 8, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021). . . . . . . . . . . . . . . . . . 46

*United States v. Ryder*, 110 U.S. 729 (1884). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

v

*United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Virginia*, 518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567 (D.V.I. June 16, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

*United States v. Zepeda*, No. cr 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Wong Wing v. United States*, 163 U.S. 228 (1896). . . . . . . . . . . . . . . . . . 17, 18, 21

*Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267 (1986). . . . . . . . . . . . . . . . . . . . . . 12

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. Const. amend V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8 U.S.C. § 1326. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. App. P. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Other Sources

Dep't of Justice, "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration" (May 7, 2018), *available at* https://www.justice.gov/opa/ speech/ attorney-general-sessions-delivers-remarksdiscussing-immigration-enforcement-actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-39

Emergency Immigration Act of 1921, Pub. L. No. 67-5, 42 Stat. 5 (1921). . . . . . 27

*Eugenical Aspects of Deportation: Hearing No. 70.1.4 Before the H. Comm. on Immigration and Naturalization*, 70th Cong. 19 (1928). . . . . . . . . . 29, 33

Eric S. Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051 (2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Kelly Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol* (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

James McPherson, *Battle Cry of Freedom* (1988). . . . . . . . . . . . . . . . . . . . . . . . 26

Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 29

Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan. 10, 2017), *available at* https://www.theatlantic.com/poli tics/archive/2017/01/jeff-sessions-1924-immigration/512591/. . . . . . . . . . 39

Undesirable Aliens Act, Pub. L. No. 70-1018, 45 Stat. 1551 (1929). . . . . . . . 33, 46

U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf. . . . . . . . . . . . . . . . . 37

U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2020, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf. . . . . . . . . . . . . . . . . 37

United Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952). . . . . . 50

Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration* (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

No. 21-4563

—————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

CLAUDIO ALVAREZ RODRIGUEZ,
*Defendant/Appellant*.

—————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Anthony J. Trenga)

—————————

BRIEF OF THE APPELLANT

—————————

## **<u>INTRODUCTION</u>**

The law criminalizing reentering the United States after deportation, 8 U.S.C. § 1326, is unconstitutional. The statute was enacted amid a torrent of racial animus against Latin Americans, and the evidence of its discriminatory purpose is overwhelming. Claudio Alvarez Rodriguez satisfied his burden of showing that the statute violates his equal protection rights, and the district court erred in denying his motion to dismiss the indictment in this case.

1

The Fifth Amendment of the Constitution provides a guarantee of equal protection of the law to all persons. A law passed with a discriminatory purpose and with a disparate impact on a disfavored group violates this principle. The Supreme Court's test for evaluating race-based challenges to laws like this one requires a court to consider factors including the historical background and legislative intent behind the law; whether the law significantly burdens one group more than another; and whether the government can show that the law would have been adopted even absent the impermissible motive. Mr. Alvarez Rodriguez met his burden to establish the animus permeating the law's passage, and the government failed to show that the illegal reentry law would have been adopted absent the discriminatory motivation.

The shameful history of § 1326 would be bad enough if it were only a stain on the nation's legacy that had been redressed at some point with an honest acknowledgment of the racism at its core. But that assessment and reevaluation has never happened. So the taint has never been purged. And the disparate impact from the law continues to this day, with the vast majority (at times, 99%) of the United States's prosecutions under the law coming against Hispanic individuals.

These facts establish an equal protection violation that this Court must remedy. This Court should adopt the well-reasoned opinion of the district court in *United States v. Carillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021), and hold that § 1326 is unconstitutional. Mr. Alvarez Rodriguez's indictment must be dismissed.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this federal criminal case pursuant to 18 U.S.C. § 3231.  That court entered the judgment of conviction and sentence on October 6, 2021.  J.A. 1175.  Mr. Alvarez Rodriguez timely filed his notice of appeal on October 19, 2021.  J.A. 1181; *see* Fed. R. App. P. 4(b)(1), (b)(6).  Therefore, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the federal statute criminalizing illegal reentry, 8 U.S.C. § 1326, is unconstitutional because it violates the equal protection guarantee of the Fifth Amendment.

## STATEMENT OF THE CASE

A.    Mr. Alvarez Rodriguez establishes a life in the United States, but is indicted for illegal reentry.

Claudio Alvarez Rodriguez was born in Mexico in 1975, and was brought to the United States as a toddler.  J.A. 9.  As he told the district court, "all I know is [the] United States."  J.A. 1157.  His parents live here as naturalized citizens, and his siblings are citizens.  J.A. 9.  Mr. Alvarez Rodriguez grew up with them in southern California, where he went to school and learned to speak English fluently.  J.A. 9. In 1987, when he was 12 years old, Mr. Alvarez Rodriguez received temporary residence status in the U.S.  Two years later, he was accorded legal permanent

3

residency.  J.A. 9.  Mr. Alvarez Rodriguez has been married to his U.S. citizen wife for fifteen years, and together they have four citizen children.  J.A. 9.

Over twenty years ago, Mr. Alvarez Rodriguez struggled with drug addiction for a period of time.  J.A. 9.  In 2001, he was convicted in California of unlawful taking of an automobile.  J.A. 9.  He received a sentence of suspended jail time and probation.    J.A.  9.    Shortly  after,  he  was  convicted  of  possession  of methamphetamine. J.A. 9.  He served sixteen months in prison for that offense.  J.A. 9.  In 2002, an immigration judge ordered Mr. Alvarez Rodriguez removed from the United States based on these state convictions.  J.A. 9-10.  Mr. Alvarez Rodriguez was removed on September 12, 2002.  J.A. 10; J.A. 1172.  He was twice stopped at the border after attempting to reenter the country and deported, most recently in February of 2004.  J.A. 10; J.A. 1172.

At some point after that, Mr. Alvarez Rodriguez entered the United States again.  Determined to avoid the problems of his prior lifestyle, Mr. Alvarez Rodriguez relocated to Virginia.  J.A. 10.  He lived in Virginia with his wife and children, and worked steadily for a towing company and a mold abatement service.  J.A. 10.

In 2021, Mr. Alvarez Rodriguez was located in Virginia by Immigration and Customs Enforcement officers.  J.A. 1173.  In August of 2021, a federal grand jury indicted Mr. Alvarez Rodriguez on one count of illegal reentry after removal subsequent to a felony conviction, in violation of 8 U.S.C. § 1326(a), (b)(1).  J.A. 7.

4

B.    Mr. Alvarez Rodriguez files a motion to dismiss the indictment
      on constitutional grounds.

Mr. Alvarez Rodriguez filed a motion to dismiss the indictment, arguing that

8 U.S.C. § 1326 is unconstitutional because it violates his right to equal protection

of the law.  J.A. 8.

Mr. Alvarez Rodriguez contended that the statute was unconstitutional because

it was enacted with a motivation of racial animus and that, over time, it has had a

disproportionate impact on Mexican and other Latin American individuals.  J.A. 10-

36.  He relied on the framework outlined in *Village of Arlington Heights v. Metro.*

*Housing Dev. Corp.*, 429 U.S. 252 (1977).  In that case, the Supreme Court held that

a legislature violates the equal protection principle when it enacts a facially neutral

law with a discriminatory purpose that disparately impacts a disfavored group.  *Id.* at

265-68.  Mr. Alvarez Rodriguez noted that a district court in Nevada had agreed with

this argument and concluded that § 1326 was unconstitutional.  *See United States v.*

*Carillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021).

The government opposed the motion to dismiss, arguing primarily that the

court need only apply rational basis review.  J.A. 387-431.  The government also

argued that § 1326 did not fail under the *Arlington Heights* test, J.A. 388-415, and

that *Carillo-Lopez* was incorrect in its constitutional analysis, J.A. 416-31.

5

The district court held a brief hearing on the motion in October 2021. J.A. 1119. The court noted that this case presented "an interesting issue where a lot of different strains of constitutional thought seem to, I don't want to say collide, but certainly bump into each other," and the government agreed. J.A. 1125. The government later acknowledged that "[t]hese questions are definitely complicated." J.A. 1126.

The parties briefly summarized their arguments. J.A. 1121-1124, J.A. 1132-1134 (defense); J.A. 1125-1132 (government). The court did not interpose many questions, but did inquire about the applicable standard of review. J.A. 1123. The government suggested that the court could assume that a heightened *Arlington Heights*-based review applies, because, according to the government, the statute survived even that heightened level of scrutiny. J.A. 1126-1127.

After hearing arguments, the court stated that it had reviewed the briefing and the many decisions from around the country on this issue, and was "not sure I can meaningfully add to the writings on and opinions on this that have already been issued." J.A. 1134. The Court noted that the question of § 1326's constitutionality had been raised in the Fourth Circuit and would likely end up before the Supreme Court. J.A. 1134.

The court announced its conclusion that § 1326 "does withstand constitutional scrutiny under the equal protection clause and is not unconstitutional based on an

impermissible motive in its origins or its provenance." J.A. 1134. The court did not elaborate further, but instead adopted the reasoning of another judge in the same district, in *United States v. Palacios-Arias*, No. 3:20-cr-62, Doc. 37 (E.D. Va. Oct. 13, 2020), *vacated and remanded on other grounds by United States v. Palacios-Arias*, No. 21-4020, 2022 WL 1172167 (4th Cir. Apr. 20, 2022). J.A. 1134; *see also* J.A. 1161 (written order denying motion).

C.   After the district court denies the motion, Mr. Alvarez Rodriguez enters a conditional guilty plea and is sentenced to time served.

In light of the district court's ruling on Mr. Alvarez Rodriguez's motion to dismiss, the parties entered into a conditional plea agreement. J.A. 1135. Mr. Alvarez Rodriguez pled guilty to the single count in the indictment while reserving his right to appeal the district court's denial of his motion. J.A. 1162 (plea agreement); J.A. 1172 (statement of facts); J.A. 1135-1152 (plea colloquy).

The court proceeded to an immediate sentencing at the conclusion of the plea hearing. J.A. 1152-1159. Mr. Alvarez Rodriguez's sentencing guideline range was zero to six months. J.A. 1152. The district court imposed a sentence of time served (about three and a half months, J.A. 1155), followed by two years of supervised release. J.A. 1158-1159; J.A. 1175-1180 (judgment).

Mr. Alvarez Rodriguez noted a timely appeal. J.A. 1181.

## SUMMARY OF ARGUMENT

The law against illegal reentry after deportation, 8 U.S.C. § 1326, is unconstitutional because it violates the equal protection guarantee of the Fifth Amendment. The standard for evaluating the legitimacy of the law is set forth in *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). Section 1326 fails the *Arlington Heights* test.

The heightened level of scrutiny under *Arlington Heights* is the proper standard for this Court's review, rather than the rational basis standard the government argued was appropriate, for three reasons. First, *Arlington Heights* applies to race-based challenges to government enactments. Second, the government's contention that deferential review applies to immigration laws is inapposite because § 1326 is a criminal law that requires more exacting scrutiny from the Court. Third, not even all immigration laws are subject to rational basis review; the cases taking that hands-off approach are distinguishable from this one. This Court should apply the more searching review outlined in *Arlington Heights*.

*Arlington Heights* directs the Court to look to evidence such as the historical background at the time of the law's passage and the disparate impact of the law on a disfavored group—here, Mexicans and other Hispanic people. The evidence submitted by Mr. Alvarez Rodriguez easily satisfies his burden of demonstrating that

racial animus was a motivating factor behind the law's enactment. Under *Arlington Heights*, the burden shifts to the government to prove that the law would have been adopted regardless of the racist intent. In this case, the government has presented next to nothing, and cannot carry its burden.

Instead, the government argued that all of the evidence about the racial animus that motivated the passage of the 1929 Act was irrelevant because the 1952 reenactment of the illegal reentry law purged any discriminatory taint. In fact, the 1920s evidence is directly apt because the 1952 Congress did not confront or address the racist history of the predecessor statute; it merely reenacted the law in substantially the same form. In such cases, the Supreme Court has held that courts should consider the racist history as continuing to underpin the law. But even if the Court considered only the evidence surrounding the 1952 Immigration and Nationality Act, it too was rife with racial animus.

Because Mr. Alvarez Rodriguez "has established that Section 1326 was enacted with a discriminatory purpose and that the law has a disparate impact on Latinx people, and the government fails to show that Section 1326 would have been enacted absent racial animus," the law is unconstitutional and Mr. Alvarez Rodriguez's indictment must be dismissed. *Carillo-Lopez*, 555 F. Supp. 3d at 1000-01.

**STANDARD OF REVIEW**

This Court "review[s] de novo a denial of a motion to dismiss an illegal reentry indictment." *United States v. Guzman-Velasquez*, 919 F.3d 841, 844 (4th Cir. 2019).

**ARGUMENT**

THE ILLEGAL REENTRY STATUTE, 8 U.S.C. § 1326, VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FIFTH AMENDMENT

The Fifth Amendment of the U.S. Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws that is identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g.*, *Arlington Heights*, 429 U.S. at 265–68. The illegal reentry statute, 8 U.S.C. § 1326, is unconstitutional under the third rationale, that is, under the legal framework of *Arlington Heights*.

10

I.    THE *ARLINGTON HEIGHTS* FRAMEWORK APPLIES IN THIS CASE, NOT RATIONAL BASIS REVIEW.

As a preliminary matter, the Court must decide the lens through which it should evaluate the constitutionality of § 1326.  The government argued for mere rational basis review, a deferential standard of review under which the law will be upheld so long as "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993); *see* J.A. 391-399.  The government is incorrect.  *Arlington Heights* provides the proper framework for analyzing the racially discriminatory law at issue here.

The district court did not resolve this dispute, either explicitly or implicitly. The government argued that it would prevail under any standard of review, J.A. 1126-1127, and the court did not further address the appropriate standard.  The same was true in *Palacios-Arias*, the decision on which the court relied.  The district court in that case assumed heightened scrutiny applied and held that "the defendant's challenge to § 1326's constitutionality fails even if the Court applies *Arlington Heights*'s analytical framework." *Palacios-Arias*, No. 3:20-cr-62, Doc. 37 at 4 n.5 (E.D. Va. Oct. 13, 2020).  This Court should not duck the question, both because of the importance of the issue, as well as to ensure that it holds the government to its burden.

11

A.    _Arlington Heights_ applies to race-based challenges.

The primary reason that the Court should follow the _Arlington Heights_ rubric

is that Mr. Alvarez Rodriguez's challenge is one based on racial discrimination.  _See_

J.A. 8 (arguing that § 1326 is unconstitutional because of racial animus and disparate

impact on Latino and Hispanic individuals).  Because Mr. Alvarez Rodriguez makes

a race-based claim, rational basis review does not apply.

 "[T]he Equal Protection Clause demands that racial classifications, especially

suspect in criminal statutes, be subjected to the most rigid scrutiny."  _Loving v._

_Virginia_, 388 U.S. 1, 11 (1967) (quotation omitted).  Indeed, "the Supreme Court has

repeatedly held that reliance 'on racial or ethnic criteria must necessarily receive a

most searching examination to make sure that it does not conflict with constitutional

guarantees.'"  _United States v. Montero-Camargo_, 208 F.3d 1122, 1134 (9th Cir.

2000) (en banc) (quoting _Wygant v. Jackson Bd. of Ed._, 476 U.S. 267, 273 (1986)).

Courts thus apply the highest level of scrutiny to race-based claims to ensure that

there is "little or no possibility" that the motive underlying government action relied

on "illegitimate racial prejudice or stereotype."  _Id._ (quotations omitted).

Courts have applied _Arlington Heights_ to a variety of laws and government

actions.  The Supreme Court did so in a challenge to a provision in the Alabama

constitution that barred voting for any person convicted of a "crime involving moral

turpitude."  _Hunter v. Underwood_, 471 U.S. 222, 225 (1985).  Though neutral on its

face, the provision disenfranchised ten times as many Black people as White people. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229-31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id.* at 231.

Similarly, the Ninth Circuit applied *Arlington Heights* in a challenge to an Arizona law shutting down a Mexican-American Studies program in the Tucson school district. *See Arce v. Douglas*, 793 F.3d 968, 981 (9th Cir. 2015). During the law's passage, legislators had accused the program of inciting "racial warfare" and supporting a group purportedly claiming that "North America is a land for the bronze peoples." *Id.* at 978. Finding that such comments created a genuine issue of material fact as to whether the law was "motivated, at least in part, by an intent to discriminate against [Mexican-American Studies] students," the Court reversed the district court's grant of summary judgment and remanded for a full trial. *Id.* at 981.

13

More recently, the Ninth Circuit applied *Arlington Heights* in a case involving the Deferred Action for Childhood Arrivals ("DACA") program. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020). There, the plaintiffs alleged that the rescission of this program was motivated by discriminatory animus against "Latinos," "individuals of Mexican heritage," and "persons of Hispanic descent." *Id.* The court of appeals rejected the government's argument that "nationality, as opposed to ethnicity," meant that a lower level of scrutiny applied. *Id.* at 519 n.29. Instead, the court applied *Arlington Heights* in part because the plaintiffs "allege[d] discriminatory intent not only toward 'Mexican nationals,' but also toward 'individuals of Mexican heritage, and Latinos.'" *Id.* at 519 n.29.

Although the Supreme Court later held that the DACA plaintiffs' allegations were insufficient to establish an equal protection violation, it did not disturb the lower court's conclusion that *Arlington Heights* applied. *See Regents*, 140 S. Ct. at 1915. Indeed, five justices analyzed the *Arlington Heights* factors on the merits. *See id.* at 1915-16; *see also id.* at 1917-18 (Sotomayor, J., dissenting). The Ninth Circuit later relied on its earlier reasoning in *Regents* to apply *Arlington Heights* in a different immigration case alleging racial discrimination. *See Ramos v. Wolf*, 975 F.3d 872, 895-96 (9th Cir. 2020).

14

Numerous district courts have also applied *Arlington Heights* to various race-based claims related to provisions in the immigration context, including the public charge ground of inadmissibility,[1] a form of humanitarian relief known as Temporary Protected Status,[2] and laws regarding so-called "sanctuary cities."[3] And even courts that have denied this particular challenge to § 1326 have frequently applied *Arlington Heights* to it.[4] As one court explained, "Congress's plenary power over immigration matters cannot be constitutionally reconciled to allow for carte blanche in enacting racially discriminatory statutes in violation of the Fifth Amendment and its guarantee of equal protection." *United States v. Wence*, No. 3:20-

---

[1] *See, e.g.*, *Cook Cnty., Illinois v. Wolf*, 461 F. Supp. 3d 779, 789 (N.D. Ill. 2020); *California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1023 (N.D. Cal. 2020); *La Clinica de la Raza v. Trump*, __ F. Supp. 3d __, 2020 WL 6940934, at *18 (N.D. Cal. Nov. 25, 2020).

[2] *See, e.g.*, *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1124 (N.D. Cal. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 325 (D. Md. 2018).

[3] *See, e.g.*, *City of S. Miami v. DeSantis*, No. 19-cv-22927, 2021 WL 4272017, at *33 (S.D. Fla. Sept. 21, 2021).

[4] *See, e.g.*, *United States v. Rios-Montano*, No. 19-cr-2123, 2020 WL 7226441, at *2 (S.D. Cal. Dec. 8, 2020); *United States v. Zepeda*, No. cr 20-0057 FMO, 2021 WL 4998418, at *2 (C.D. Cal. Jan. 5, 2021); *United States v. Wence*, No. 3:20-cr-0027, 2021 WL 2463567, at *4 (D.V.I. June 16, 2021); *United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738, at *10 (D. Or. Aug. 3, 2021); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407, at *3 (D. Colo. Dec. 28, 2021); *United States v. Munoz-de la O*, No. 2:20-cr-134-RMP-1, 2022 WL 508892, at *9 (E.D. Wash. Feb. 18, 2022).

cr-27, 2021 WL 2463567, at *3 (D.V.I. June 16, 2021); *see also Carillo-Lopez*, 555 F. Supp. 3d at 1001-02 (rejecting government's argument for rational basis review).

As all these courts recognize, rational basis review is especially ill-suited for assessing a race-based challenge. An alternative rule would prohibit courts from considering blatant evidence of racial animus and disparate impact "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Comm's, Inc.*, 508 U.S. 307, 313 (1993). Such a standard would not comport with decades of precedent requiring a more searching review of racially discriminatory laws.

B.    As a criminal law, § 1326 should not receive the deference given to immigration laws.

The government also argued that rational basis review was appropriate because of the deference courts typically afford to Congress's power to regulate immigration. J.A. 391. But this contention fails when applied to § 1326 because it is a *criminal* law, not an immigration regulation. The maximum penalty for a violation is not a civil fine or an administrative remedy like deportation, but rather twenty years of imprisonment. *See* 8 U.S.C. § 1326(b)(2); *see also I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038-39 (1984) (noting distinction between "purely civil" immigration law with its "prospective" focus on a person's "right to remain in this country in the future" and criminal statutes with purpose to "punish past trangressions"). As Justice

16

Gorsuch noted, "the criminal standard should be set *above*" the standard in civil cases, and "the civil standard should be buried *below* it." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring) (emphases in original).

The Supreme Court has applied heightened scrutiny to criminal laws—even in the immigration context—for over 125 years. As part of the Chinese Exclusion Act, Congress created a law barring Chinese nationals from entering or remaining in the United States and punishing violators with up to one year of imprisonment. *See Wong Wing v. United States*, 163 U.S. 228, 234 (1896). Before the Supreme Court, the government tried to characterize this law as a "political offense" not eligible for a jury trial or other Fifth or Sixth Amendment criminal protections. *Id.* But the Court rejected that argument, relying on the "distinction between those provisions of the statute which contemplate only the exclusion or expulsion of Chinese persons and those which provide for their imprisonment at hard labor"—the latter of which required a jury trial. *Id.* at 236 (emphases added). The Court refused to apply a relaxed version of the Constitution to noncitizens charged with immigration crimes, even when Congress enacted those crimes to deter unlawful immigration.

*Wong Wing* established several important principles relevant to this case. It held that Congress may create the crime of illegal entry, which Mr. Alvarez Rodriguez does not dispute. *See* 163 U.S. at 235 (holding that Congress may "declare the act of an alien in remaining unlawfully within the United States to be an offense

17

punishable by fine or imprisonment"). It also confirmed that Congress may deport noncitizens and detain them during the process. *See id.* Again, Mr. Alvarez Rodriguez does not argue otherwise. But *Wong Wing* showed that none of these principles diminish a defendant's Fifth Amendment protections merely because they are charged with an immigration-related crime. And in language directly applicable to this case, *Wong Wing* observed that noncitizen defendants charged with illegal entry receive "*equal protection of the law* . . . within the territorial jurisdiction, without regard to any differences of *race*, of color, or nationality." *Id.* at 238 (emphases added).

Since *Wong Wing*, courts have always distinguished between the rights afforded to people in criminal and in immigration proceedings. *See Lopez-Mendoza*, 468 U.S. at 1038-43 (collecting cases holding that many constitutional guarantees in criminal proceedings do not apply in immigration proceedings). Treating § 1326 like an immigration law would allow the government to rely on the distinction between immigration and criminal laws in the immigration context (where it would deprive noncitizens of rights), and elide the distinction in the criminal context (where it would provide noncitizens with more rights). This Court should reject the government's attempt to portray § 1326 as an immigration law in order to gain the advantage of a lower level of scrutiny.

18

C.    *Arlington Heights* can still apply to immigration laws.

Finally, even if § 1326 could be characterized as solely an immigration regulation, that does not automatically mean that rational basis review applies. "A challenged law does not receive minimal scrutiny merely because it is related to immigration." *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018). Courts have applied heightened scrutiny to race-based challenges to immigration laws. *See Carillo-Lopez*, 555 F. Supp. 3d at 1002 (collecting cases). Notably, a plurality of the Supreme Court declined the government's request for a lower standard of review in *Regents*, 140 S. Ct. at 1915-16. That case, like this one, involved a race-based equal protection challenge, and even in the immigration context—not the criminal arena like this case—the Court did not apply mere rational basis review.

The government pointed to *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018), and *Othi v. Holder*, 734 F.3d 259, 269 (4th Cir. 2013), as cases applying minimal scrutiny in the immigration context. J.A. 392. But those cases are distinguishable. They did not involve race-based claims; they involved plaintiffs who were seeking admission to the United States rather than already present here, *Othi*, 734 F.3d at 267; and the decisions turned on the executive's power to manage foreign policy and national security. *See Cariollo-Lopez*, 555 F. Supp. 3d at 1002 (distinguishing *Trump*); *see also Regents*, 908 F.3d at 520; and *Wolf*, 975 F.3d at 895 (same). Another case the government cited (at J.A. 392) was *Sesay v. United States*, 984 F.3d

312, 316 (4th Cir. 2021); it, too, involved a visa applicant seeking admission and did not involve a claim of racial discrimination. *Id.* at 314.

Also distinguishable is *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), on which the government relied as well. J.A. 391, J.A. 393. That case applied deferential review to a suit by plaintiffs raising, among other claims, a gender-based challenge to an immigration regulation giving preferences to unwed mothers but not unwed fathers. *Fiallo*, 430 U.S. at 788-90. Again, that case involved persons seeking "admission" in the form of immigrant visas, which are easier to obtain for the children of citizen parents. *Id.* at 790 & n.3. Mr. Alvarez Rodriguez's case does not involve initial admission, but rather criminal penalties. Moreover, at the time *Fiallo* was decided, the Supreme Court did not apply more exacting scrutiny to gender-based equal protection claims, as it did for race-based claims. It is fair to ask if the case would be decided the same way now. *Cf. United States v. Virginia*, 518 U.S. 515, 555 (1996) (holding that "all gender-based classifications today warrant heightened scrutiny") (quotation and citation omitted).

The government also pointed to *Kleindeinst v. Mandel*, 408 U.S. 753, 761 (1972), in its request for a lower standard of review. *See* J.A. 392-393. *Mandel* is easily distinguishable, as it involved a First Amendment claim over the denial of a foreign scholar's request to enter the United States to attend academic meetings. *Mandel*, 408 U.S. at 754. Once again, that case involved an application for initial

admission to the United States, and once again, that case did not present a race-based challenge to the law.

*     *     *

The most the government's cases can establish is that rational basis review applies to most immigration cases. They do not stand for the proposition that minimal scrutiny is always appropriate. If rational basis review applied in every immigration case regardless of the claim presented, the Supreme Court's *Regents* decision would have said so.

Most importantly, this case is not an immigration case, but a criminal one. The question is not whether Mr. Alvarez Rodriguez is admissible, but whether he can be sent to prison. As far back as *Wong Wing*, the Supreme Court has held that greater protections under the Fifth Amendment apply when the government seeks to "punish by deprivation of liberty and property." *Wong Wing*, 163 U.S. at 237 (alteration omitted). And that is especially true with regard to claims of racial discrimination. This Court should follow the numerous other courts that have "applied *Arlington Heights* to race-based immigration challenges brought by individuals residing in the United States, including when reviewing equal protection challenges to Section 1326." *Carrillo-Lopez*, 555 F. Supp. 3d at 1003 (footnotes citing cases omitted).

II.    UNDER THE *ARLINGTON HEIGHTS* FRAMEWORK, § 1326 IS UNCONSTITUTIONAL

A.    *Arlington Heights* creates a burden-shifting framework with a low threshold for challengers to meet.

The equal protection guarantee in the Fifth Amendment prohibits the passage of a law with a racially discriminatory purpose and that has a racially disparate impact. *Arlington Heights*, 429 U.S. at 265-68. *Arlington Heights* established a burden-shifting framework. In order to succeed on an equal protection claim, the challenger must show "[p]roof of racially discriminatory intent or purpose" at the time of the law's passage. *Id.* at 265. Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

(1)    the historical background of the decision;

(2)    the specific sequence of events leading to the challenged action;

(3)    departures from normal procedural sequence;

(4)    the legislative history; and

(5)    the disproportionate impact of the official action, i.e., "whether it bears more heavily on one race than another."

*North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 266-68).

22

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265-66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265-66 (emphasis added).

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." 429 U.S. at 270 n.21; *see also Hunter*, 471 U.S. at 228 (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor"). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Hunter*, 471 U.S. at 225.

This Court applied *Arlington Heights* in a challenge to a statute enacted by the North Carolina legislature imposing a number of voting restrictions that disproportionately affected African Americans. *See McCrory*, 831 F.3d at 216. There, the Court stated that "the ultimate question remains: did the legislature enact a law 'because of,' and not 'in spite of,' its discriminatory effect." *Id.* at 220. The

23

Court held that the district court had "missed the forest in carefully surveying the many trees . . . [leading it] to ignore critical facts bearing on legislative intent, including the inextricable link between race and politics in North Carolina." *Id.* at 214.

This Court has observed that "outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *McCrory*, 831 F.3d at 221 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) (alteration omitted)).  And as *Carillo-Lopez* concluded, the racial animus that infects § 1326 is apparent from both the context and the plain language employed by those who enacted the original statute.  555 F. Supp. 3d at 1009 (noting that "the Act of 1929 was passed during a time when nativism and eugenics were widely accepted, both in the country at large and by Congress, and that these racist theories ultimately fueled the Act's passage").  An application of the *Arlington Heights* factors demonstrates the unconstitutionality of § 1326.

B.    Congress enacted the illegal reentry statute with a discriminatory purpose.

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed."  *Arlington Heights*, 429 U.S. at 268.  And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the

statute's constitutionality. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020) ("Though it's hard to say why these laws persist, their origins are clear. Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898. According to one committee chairman, the avowed purpose of that convention was to 'establish the supremacy of the white race,' and the resulting document included many of the trappings of the Jim Crow era: a poll tax, a combined literacy and property ownership test, and a grandfather clause that in practice exempted white residents from the most onerous of these requirements."). A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not merely a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the primary factor.

Even in rejecting a similar challenge to § 1326, the Fifth Circuit recognized the law's "troubling history." *United States v. Barcenas-Rumualdo*, ___ F.4th ___, ___, No. 21-50795, 2022 WL 17072285, at *4 (5th Cir. Nov. 18, 2022). But the Fifth Circuit did not conduct a proper *Arlington Heights* analysis, and so its ultimate conclusion rests on an insecure foundation. *See id.* at *7 (Graves, J., dissenting) ("I disagree with the majority's conclusion that 8 U.S.C. § 1326 does not violate the principles of equal protection."). This Court can and should perform the requisite constitutional assessment under the appropriate methodology.

1.     <u>"The historical background of the decision"</u>

Historians often refer to the 1920s as the "Tribal Twenties," a time when the

Ku Klux Klan strengthened, Jim Crow laws were enacted, and public figures praised

eugenics.[5] World War I had produced "a feverish sentiment against presumably

disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism,

job scarcity, and anti-Bolshevism that fueled the politics of restriction."[6]  Prominent

---

[5]  Mr. Alvarez Rodriguez cites in this brief, as he did in the district court, to historical documents, books, and articles in this section not because they are binding on this Court, but for their informational value in assessing the background behind § 1326.  Litigants and courts often refer to authoritative historical sources, even if the documents are not wholly incorporated into the record.  *See, e.g.*, *Ortiz v. United States*, 138 S. Ct. 2165, 2179 (2018) (citing acclaimed one-volume history of the Civil War by James McPherson, *Battle Cry of Freedom* 596-97 (1988)).  Indeed, references to such sources to discuss the historical context relevant to legal questions is common.  *See, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (citing, inter alia, books and articles on the disputed historical background of the right to bear arms).

Nonetheless, in a case being held in abeyance for this one, the government moved to strike similar citations in the appellant's brief.  *See United States v. Lemus Villalobos*, No. 21-4604, Doc. 23 (Apr. 19, 2022).  In that case, the equal protection claim was being raised on plain error.  Here, Mr. Alvarez Rodriguez cited these sources in the district court (thus giving the court the opportunity to address the history of § 1326) and the government did not complain.  The Court should reject any newly-made objection were it to be made for the first time on appeal in this case.

[6]  Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 19, 20 (2004); *see also United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1065 (D. Or. 2021) (citing Ngai's book for historical background).

26

restrictionists "spoke increasingly of 'racial indigestion,'"[7] and "the 'contamination' of Anglo-American society."[8]  The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[9] At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[10] During the remainder of the decade, legislators aimed for "America [to] cease to be the 'melting pot.'"[11]  Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups

---

[7]  Ngai, supra, at 23.

[8]  Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol* 28 (2010); *see also Carrillo-Lopez*, 555 F. Supp. 3d at 1008 (outlining this history and citing to Professor Lytle Hernández's works and testimony).

[9]  *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019) (discussing this history); *see also Machic-Xiap*, 552 F. Supp. 3d at 1064-70 (discussing context of "Undesirable Aliens Act of 1929," and finding that "[t]he 1929 Act also solidified perceptions of persons from Latin America as a separate, unwelcomed race").

[10]  *See* Emergency Immigration Act of 1921, Pub. L. No. 67-5 §2(a), 42 Stat. 5, 5 (1921) (establishing quota system); *see also* Eric S. Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051, 1061 (2022) (describing connection between eugenics movement and immigration quotas).

[11]  Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration* 3 (2020) (quoting Senator David A. Reed).

as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[12]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[13] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[14] The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[15] And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[16]

---

[12] Lytle Hernández, supra, at 28.

[13] Yang, supra, at 35; *see also Carillo-Lopez*, 555 F. Supp. 3d at 1009 (noting ties between eugenics movement and quest to limit immigration); *Machic-Xiap*, 552 F. Supp. 3d at 1064 (noting popularity of eugenics theory in early 20th century).

[14] Yang, supra, at 8.

[15] Okrent, supra, at 3.

[16] *Id.* at 38.

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[17] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Nazi regime in Germany, used as a template.  During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population."[18]  Relying heavily on these theories, Congress would anchor its immigration legislation in theories of eugenics and alleged racial inferiority for the remainder of the decade.  *Machic-Xiap*, 552 F. Supp. 3d at 1066-68; *Carillo-Lopez*, 555 F. Supp. 3d at 1009.

This historical background, laden with racist tropes and animus, was the canvas on which Congress enacted its early immigration legislation.

> 2.    "The specific sequence of events leading to the challenged action"

The "specific sequence of events" leading up to the passage of a law against illegal reentry reveals a discriminatory intent on the part of lawmakers.  In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable"

---

[17]  Ngai, supra, at 24.

[18]  *See, e.g.*, J.A. 39-127 (*Eugenical Aspects of Deportation: Hearing No. 70.1.4 Before the H. Comm. on Immigration and Naturalization*, 70th Cong. 19 (1928) (statement of Harry H. Laughlin)); *Machic-Xiap*, 552 F. Supp. 3d at 1066.

immigrants—which was often code for "non-white." *See Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 505-06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"); *Cromartie*, 526 U.S. at 553 (acknowledging that "outright admissions of impermissible racial motivation are infrequent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1920 census. *Carillo-Lopez*, 555 F. Supp. 3d at 1008.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[19] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asian people (including those who had American citizenship by birth); and all citizens in Hawaii, Puerto Rico, and Alaska.[20]

Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[21] But the National Origins Act did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large

---

[19] Yang, supra, at 24-25.

[20] *Id.* at 26.

[21] *Id.* at 35.

30

agricultural businesses that relied heavily on labor from just over the border.[22]  As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons."  *See* J.A. 134 (Feb. 16, 1929 Congressional Record excerpt, at 3619).

Some legislators wanted to go further than the restrictions in the 1924 Act. Representative Madden remarked that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon."  *See* J.A. 146 (April 8, 1924 Congressional Record excerpt, at 5841).  Representative O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a fullblooded Airedale is to a mongrel."  *See* J.A. 205 (*id.* at 5900).  Legislators proposed numerous bills restricting Mexican immigration, but none could survive opposition from southwestern growers.  To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle. *Carillo-Lopez*, 555 F. Supp. 3d at 1008.

---

[22]  *See Machic-Xiap*, 552 F. Supp. 3d at 1064 (describing legislative "compromise between southwestern agribusiness leaders who relied on undocumented aliens from Mexico and Central America for cheap labor and nativists in Congress who increasingly viewed immigrants from Latin America as a threat to blood purity in the United States").

3.    "The relevant legislative or administrative history"

*Arlington Heights* instructs this Court to review the "relevant legislative or administrative history" of the challenged enactment. 429 U.S. at 268. For several years after the passage of the National Origins Act of 1924, various legislators attempted to apply quotas to immigration from Latin America. Eventually they struck on a solution that was acceptable to agricultural concerns—criminal penalties for unauthorized border crossings.

In the district court, Mr. Alvarez Rodriguez described at length the specific contours of the legislative brokering. J.A. 20-28. The progenitors of the plan were Secretary of Labor James Davis and South Carolina Senator Coleman Blease. They joined with Representatives John C. Box of Texas and Albert Johnson of Washington. J.A. 21-22. Rep. Box expressed his goals in explicitly racist terms. For instance, he wanted to protect "American racial stock from further degradation or change through mongrelization." J.A. 270 (Feb. 9, 1928, Cong. Rec. at 2817). Rep. Box felt that increased immigration was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." J.A. 134-135 (Feb. 16, 1929, Cong. Rec. at 3619-20).

Rep. Johnson was a sponsor of the 1924 act, which he described as a "bulwark against a stream of alien blood." J.A. 22. He made clear that unlike previous immigration restrictions based on economic concerns, "the fundamental reason for

[new restrictions, including criminal penalties] is biological." J.A. 23. Johnson, as chairman of the House Immigration and Naturalization Committee, held a hearing in 1926 that referred approvingly to a constituent's desire to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." J.A. 23; J.A. 310-344. The Committee also convened a hearing on eugenics at which Dr. Laughlin testified, and during which Rep. Johnson stated approvingly that eugenics theory would "bear intimately on immigration policy." J.A. 43 (*The Eugenical Aspects of Deportation* Hearing at 3).

With Rep. Johnson providing the philosophical underpinning for the new system, Sen. Blease and Secretary Davis were able to get agribusiness leaders on board with a criminal law that would not threaten their use of migrant workers. J.A. 18-19; *see also* J.A. 346-347 (S.R. No. 1456, Jan. 17, 1929). During the brief floor debate, representatives made racist remarks, including testimony from Representative Fitzgerald arguing that Mexicans were "poisoning the American citizen" because they were of a "very undesirable" class. *Carrillo-Lopez*, 555 F. Supp. 3d at 1009; *Machic-Xiap*, 552 F. Supp. 3d at 1067; J.A. 134. The compromise bill passed both houses very quickly, and President Hoover signed it into law three days later. *See* J.A. 366-367; Undesirable Aliens Act, Pub. L. No. 70-1018, 45 Stat. 1551 (1929).

This legislative history easily clears the relatively low threshold of showing that racism and eugenics were a "motivating factor" for enacting the law. Like other

33

*Arlington Heights* cases, passage of the racially motivated law followed a predictable pattern. A broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *See Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks"). Dr. Laughlin, the notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress. Key lawmakers like Reps. Johnson and Blease and Sen. Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Cf. McCrory*, 831 F.3d at 226 (noting that, "in what comes as close to a smoking gun as we are likely to see in modern times, the State's very justification for a challenged statute hinges explicitly on race—specifically its concern that African Americans, who had overwhelmingly voted for Democrats, had too much access to the franchise.") (citations omitted); *Arce*, 793 F.3d at 978-79 (legislators accused ethnic studies program of inciting "racial warfare").

Other legislators expressed similar sentiments. And even congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of Mexicans during legislative sessions in the five years leading up to the law's passage. *Cf. Democratic National Committee v. Hobbs*, 948 F.3d 989, 1041 (9th Cir. 2020) (finding that "good faith belief" of "sincere legislators" did not shield law from discriminatory, motivating factor under the "cat's

34

paw" doctrine—where others convinced these legislators to act based on others' discriminatory motives). In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law compares favorably to evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

> 4.    "The legislature's departures from normal procedures of substantive conclusions"

Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider the timing of the enactment of a law that could signal a discriminatory intent. *See Arlington Heights*, 429 U.S. at 268. Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 507 (citing the city's decision to "disregard the zoning advice of its own experts"). Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, as *Carillo-Lopez* found, "the 1920s was the first and only era in which Congress openly relied on the now discredited theory of eugenics to enact immigration legislation, with illegal reentry laws as one of few laws still in effect

from that era." 555 F. Supp. 3d at 1009 (quotation and citation omitted). Indeed,

Congress has since repealed the 1924 National Origins Act and its system of quotas.

*See* Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911

(1965).

Second, the motivation for the 1929 Act was expressed in racist terms almost

exclusively against Mexicans, which was an illogical premise because not all

immigrants were coming from that country. *Machic-Xiap*, 552 F. Supp. 3d 1055,

1067 (noting that "although all kinds of people were eligible for deportation, Border

Patrol was mostly deporting one population, immigrants from south of the border")

(quotation omitted). In fact, a record number of Canadians entered the U.S. in 1928,

but congressional legislators said little about them, and said nothing characterizing

Canadians as a "mongrel horde" fouling the bloodlines of Americans. *See Carillo-*

*Lopez*, 555 F. Supp. 3d at 1009.

In sum, the process behind the passage of the 1929 Act was far from normal.

Instead, it was motivated by racial animus to the exclusion of any legitimate purpose,

and rested on the now-discredited theory of eugenics. Rather than respond logically

to any perceived economic or public safety concern, lawmakers imposed penalties

specifically aimed at Hispanics. This Court cannot bless that history as the normal

legislative process.

5.    <u>"The impact of the official action and whether it bears</u>
<u>more heavily on one race than another"</u>

*Arlington Heights* requires challengers to show that a law was enacted with a

discriminatory purpose and disparately impacts a particular group.  429 U.S. at 265.

Here, not only were racism and eugenics a discriminatory purpose motivating the

enactment of the first border crossing laws, such laws continue to disparately impact

Mexican and other Hispanic people.

Immediately after passage of the 1929 Act, prosecutions of people from

Mexico skyrocketed.  Within a year, the government had prosecuted approximately

7,000 border crossing cases; within a decade, that number rose to over 44,000.  J.A.

31.  The numbers remain high today, with illegal reentry being one of the most

commonly charged federal crimes.  Between 2017 and 2019, the government brought

over 22,000 cases under § 1326.  U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry*

*Offenses*, Fiscal Year 2019, *available at* https://www.ussc.gov/sites/default/files/pdf/

research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.  In 2019 and 2020,

99% of defendants convicted of illegal reentry were Hispanic.  *See id.*; U.S. Sent.

Comm'n, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2020, *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

facts/Illegal_Reentry_FY20.pdf.

These disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *McCrory*, 831 F.3d at 216-218 (dissecting the multiple ways in which North Carolina voting law, which relied on data showing racial breakdown of early voting usage, disproportionately targeted mechanisms relied on by African American voters); *Ave. 6E Investments*, 818 F.3d at 497 (challenge to concentrating most low-income housing in neighborhoods that are 75 percent Hispanic); *Arce*, 793 F.3d at 978 (targeting a program 90% of whose enrollees were of Mexican or other Hispanic origin); *The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (excluding from benefits neighborhoods where 71% of the population classified as Latino, while extending those benefits to other areas that were only 47% Latino).

Moreover, the government continues to apply § 1326 in a racially disparate fashion. As noted, recent prosecutions are almost exclusively against Mexican and other Hispanic individuals. And this was not mere happenstance, but rather official policy. Then-Attorney General Sessions required the Department of Homeland Security to refer "100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution." J.A. 32 (citing Dep't of Justice, "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration" (May 7, 2018), *available at* https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarksdis

38

cussing-immigration-enforcement-actions).  No such directive applied to crossings of the border with Canada.  In echoes of language quoted above, the Attorney General noted the rising percentage of "non-native born" Americans and observed that when immigration levels were "about this high in 1925," the President and Congress "changed the policy, and it slowed down immigration significantly."  He warned that repeal of those policies in 1965 had primed the country for a "surge fast past what the situation was in 1924."  J.A. 33 (citing Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan. 10, 2017), available at https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/).

Together, this data and this longstanding policy demonstrate that the illegal reentry law continues to have a disparate impact on Mexicans and other Hispanic people, consistent with its initial purpose as a racially motivated tool targeted at those individuals.  *See Carillo-Lopez*, 555 F. Supp. 3d at 1005-07 (finding that "Section 1326 disparately impacts Latinx individuals").

6.  The government has not met its burden.

Once a challenger satisfies their burden to show that racial discrimination was a "motivating factor," the burden shifts to the government. *Arlington Heights*, 429 U.S. at 270 n.21.  Then, the government must show that the legislature would have

enacted the challenged law "even if the impermissible purpose had not been considered." *Id.*

In this case, the government did not meet its burden, or even seriously attempt to make the required showing. Instead, the government primarily argued that the *Arlington Heights* burden-shifting framework should not apply at all, and that in any event, passage of the Immigration and Nationality Act of 1952 purged any possible racist motivation behind the 1929 Act. *See* J.A. 391-392; J.A. 401-403; J.A. 418-425.

The problems with the 1952 Act are addressed below. With regard to the burden under *Arlington Heights*, the government has not proven that Congress would have enacted an illegal reentry offense in 1929 if racial animus had not been at least a motivating factor. Indeed, the court in *Carrillo-Lopez* found that "Carrillo-Lopez has established, *and the government concedes*, that the Act of 1929 was motivated by racial animus." 555 F. Supp. 3d at 1028 (emphasis added); *see also United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774, at *2 (S.D. Tex. Feb. 2, 2022) (noting that nearly every district court to have considered the issue has "acknowledged the racial animus behind the 1929 law"); *Barcenas-Rumualdo*, ___ F.4th at ___, 2022 WL 17072285, at *4 (noting 1929 Act's "troubling history").

*Carrillo-Lopez* went beyond this finding and examined each of the government's proffered alternative bases for the 1929 law, and found that they would not have led to passage of the Act absent the racist motivation. *Id.* at 1022-27. The

court found that none of the "three allegedly permissible motivations: (1) a desire to protect American citizens from economic competition; (2) a need to maintain national security; and (3) a need to maintain foreign relations with international allies" could "easily be separated from the demonstrated discriminatory intent." *Id.* at 1022. Again, the government did not even present those arguments in Mr. Alvarez Rodriguez's case. But regardless, *Carillo-Lopez* explains at considerable length why they are insufficient to satisfy the government's burden.

First, economic protectionist motives were inextricably intertwined with racial animus, in that Whites and native-born Americans were portrayed as on the defensive from, particularly, Mexicans who wanted to steal their jobs. At the same time, Hispanic people were stereotyped as only being fit for migrant labor and low-skilled jobs. *Id.* at 1023. Second, even if national security concerns were part of the reason for reenacting the illegal reentry law, "racial animus is also at play" because Hispanic individuals were treated worse than immigrants from other nations, and so the need to maintain national security was not the sole motivating purpose for the law. *Id.* at 1024. Finally, the interest in maintaining good foreign relations with Mexico did not override the racial animus motivation, because Mexico was a "junior partner" in the relationship and could not dictate how the United States should shape its immigration policy. *Id.* at 1024-25. At bottom, the government has presented no evidence that Congress passed the law primarily to build good will with Mexico.

41

\*   \*   \*

Mr. Alvarez Rodriguez has surmounted his low threshold burden under *Arlington Heights* to show that racial animus was a motivating factor behind the passage of the 1929 illegal reentry law. The historical background and legislative history of the Act, in an atmosphere replete with utterances of racist invective and racial stereotypes, establish convincingly that the law was passed with discriminatory intent. The disparate impact of the law on Hispanic people was part of its design. Finally, the government has not met its burden to prove that the law would have been enacted regardless of this discriminatory purpose. Application of the *Arlington Heights* framework leads to the inescapable conclusion that § 1326 violates the principle of equal protection of the law.

III.   THE 1952 REENACTMENT DID NOT ADDRESS THE RACIST ORIGINS OF § 1326 AND WAS ALSO MOTIVATED BY DISCRIMINATORY INTENT.

In the district court, the government argued that any racist motivation or disparate impact from the 1929 Act was irrelevant, since Congress enacted the INA in 1952; according to the government, this reenactment purged any lingering taint from the 1929 law. J.A. 401-410; J.A. 416-431. The decision the district court in this case adopted, *Palacios-Arias*, accepted this argument. J.A. 1134; *Palacios-Arias*, No. 3:20-cr-62, Doc. 37, at 5-8 (E.D. Va. Oct. 13, 2020). The government's position is incorrect, however, for two reasons: first, the 1952 enactment did not even attempt

42

to remove the racist background or motivation for the 1929 version; and second, racial animus continued to be a motivating factor for the 1952 law.

A.   Subsequent reenactments did not erase the racial animus that motivated the 1929 law.

When it enacted the INA in 1952, Congress made no attempt to address the background, detailed above, that drove the legislature to create the original illegal reentry statute. It did not debate, acknowledge, or apologize for the racist history leading up to the passage of the 1929 law. And it did not try to come up with any other way to criminalize border crossings without resulting in a racially disparate outcome. "[T]here has been no attempt at any point to grapple with the racist history of Section 1326 or remove its influence on the legislation." *Carrillo-Lopez*, 555 F. Supp. 3d at 1026.

Under analogous circumstances, the Supreme Court has confirmed that a legislature's failure to take these steps means that the racist stain on the law remains vivid and determinative. Indeed, the Court has repeatedly affirmed that "we do not presume that the revision worked a change in the underlying substantive law 'unless an intent to make such [a] chang[e] is clearly expressed.'" *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) (quoting *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957)); *see also Hunter*, 471 U.S. at 232-33 (later enactments do not "legitimate" provision when statute's original enactment motivated

43

by racial animus); *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198-99 (1912) ("[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed."); *United States v. Ryder*, 110 U.S. 729 (1884) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed.").

Lest there be any doubt, in recent terms, the Supreme Court has again held that the failure to consciously and explicitly address the discriminatory basis for a law means that the animus-based motive remains present in the reenacted provision. First, the majority in *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 & n.44 (2020), rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, finding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." The majority pointed out that the undisputed history of the law showed that Louisiana constitutional convention delegates "sculpted a facially race-neutral rule" to "ensure that African-American juror service would be meaningless." *Id.* at 1394 (quotations omitted). The Supreme Court refused to "leav[e] an uncomfortable past unexamined" when considering the "very functions [jury] rules were adopted to serve." *Id.* at 1401 n.44.

44

Later that term, the Supreme Court struck down a Montana law banning the use of public school funds at religious schools. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination to overturn it, even though the law was later reenacted "for reasons unrelated to anti-Catholic bigotry." *Id.* at 2259. In a concurring opinion, Justice Alito described the anti-Catholic bigotry motivating the law's original passage and reminded us that "the provision's origin is relevant." *Id.* at 2267 (Alito, J., concurring). "Under *Ramos*," he explained, "it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons" because the law's "uncomfortable past must still be examined." *Id.* at 2273 (quotations and alterations omitted). Justice Alito noted that although he had dissented in *Ramos*, "I lost, and *Ramos* is now precedent." *Id.* at 2268. Because the specific terms in the Montana law "keep it tethered to its original bias," and it was "not clear at all that the State actually confronted the provision's tawdry past in reenacting it," Justice Alito agreed with the majority that the statute was unconstitutional. *Id.* at 2274 (citing *Ramos*, 140 S. Ct. at 1410) (Sotomayor, J., concurring) (quotations and alterations omitted)).

In the district court, the government rejected these examples by arguing that *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), and its "presumption of legislative good faith" means that the 1952 INA is not burdened by the racist history of the 1929

45

Act.  J.A. 404.  But the government's reliance on *Abbott* is misplaced, "because a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." *Carillo-Lopez*, 555 F. Supp. 3d at 1010 (citing *Hunter*, 471 U.S. at 232-33) (finding that when a statute's original enactment was clearly motivated by racial animus, later amendments did not "legitimate[ ]" the provision).  *Abbott* itself distinguished *Hunter*, where, the Court noted, a law "originally enacted with discriminatory intent is later reenacted by a different legislature" and "arguably carried forward the effects of any discriminatory intent." *Abbott*, 138 S. Ct. at 2325.  *Abbott* noted that, unlike in *Hunter*, the law at issue in *Abbott* was not simply reenacted in substantially the same form.  *Id.* at 2324-25; *see also id.* at 2316 (declining to consider original motives because law had been "substantially changed" and "markedly altered" by subsequent reenactment).

Whatever presumption *Abbott* recognized, Mr. Alvarez Rodriguez has defeated it by showing that—like the law in *Hunter*—the 1952 illegal reentry law is largely identical to the 1929 version.  The 1929 version of illegal reentry stated that if a noncitizen has been "arrested and deported in pursuance of law" and later "enters or attempts to enter the United States," they "shall be guilty of a felony" and "punished by imprisonment for not more than two years." Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929).  Similarly, the current version states that if a noncitizen has been

"denied admission, excluded, deported, or removed" and later "enters, attempts to enter, or is at any time found in, the United States," they shall be "imprisoned not more than two years." 8 U.S.C. § 1326(a). These versions "bear substantially similar language" to one another. *United States v. Rizo-Rizo*, 16 F.4th 1292, 1298 (9th Cir. 2021). Aside from minor technical differences,[23] the statute criminalizes the same basic conduct as it did in 1929—reentering the United States after a prior deportation. "The INA changed little" about "how Congress defined the crime of illegal reentry." *Machic-Xiap*, 552 F. Supp. 3d at 1070.

Because the 1952 version of the illegal reentry statute did not make substantive changes to the pre-existing law, the Court, according to *Ramos* and *Espinoza*, must consider the racist background from the 1929 Act when evaluating the constitutionality of the current version of the offense. "[T]he initial and recodified unlawful reentry statutes are nearly identical." *Carrillo-Lopez*, 555 F. Supp. 3d at 1018 (rejecting government's reliance on *Abbott*).

---

[23] The current version also criminalizes reentries that occur when an order of removal is outstanding and exempts people who have either obtained, or need not seek, consent to reenter. *See* 8 U.S.C. § 1326(a). And although the 1952 Congress removed language requiring that the noncitizen be "deported in pursuance of law," the Supreme Court subsequently held that a deportation must "comport with the constitutional requirement of due process." *United States v. Mendoza-Lopez*, 481 U.S. 828, 835, 837 (1987).

B.    <u>The 1952 enactment was also motivated by discriminatory intent.</u>

Even if the 1952 Congress had merely silently reenacted the 1929 law, that would be damning enough in its lack of forthright, affirmative reckoning with the law's racist origins.  But the Congress that passed the 1952 INA was not silent.  The passage of that law was also suffused with racial animus.  Considered either by itself, or piled on top of the evidence regarding the 1929 Act, that background satisfies the *Arlington Heights* test.

In the district court, Mr. Alvarez Rodriguez relied on *Carillo-Lopez* and the facts which that court found pointed to that establish a discriminatory purpose behind the 1952 law.  *See* J.A. 35-36; J.A. 1111-1116; *Carillo-Lopez*, 555 F. Supp. 3d at 1010-17.  Those facts included:

> a relative lack of discussion compared to robust Congressional debate regarding other provisions of the INA; explicit, recorded use of the derogatory term "wetback" by supporters of Section 1326; Congressional silence while increasingly making the provision more punitive; Congress' failure to revise in the face of President Truman's veto statement calling for a reimagination of immigration policy; knowledge of the disparate impact of Section 1326 on Mexican and Latinx people; and passage of the so-called "Wetback Bill" by the same Congress only months prior.

*Carillo-Lopez*, 555 F. Supp. 3d at 1011.

First, there was a telling "lack of debate" over the illegal reentry provision compared to other aspects of the 1952 INA.  *Id.*  Congress was "more concerned with

48

which racial and ethnic groups warranted continued discriminatory exclusion, rather than any desire to confront or revise the nativism reflected in the Act of 1929." *Id.* at 1112. Indeed, members of Congress noted the "problematic racial aspects" of the 1924 National Origins Act, but paid no mind to similar problems with the 1929 Act. *Id.* As *Carillo-Lopez* observed, because "the 1952 Congress ignored the express nativist intent behind the Act of 1929, there is no reason to assume that the later enactment arose from some wholly unrelated motivation cleansed from discriminatory intent." *Id.*

Second, Congress passed the INA over President Truman's veto. *See* J.A. 369-372 (veto statement). The President condemned the INA as "legislation which would perpetuate injustices of long standing against many other nations of the world" and "intensify the repressive and inhumane aspects of our immigration procedures. According to President Truman, the INA "would continue, practically without change" discriminatory practices first enacted in 1924 and 1929—a system "based on assumptions at variance with our American ideals." J.A. 369-370. To be sure, as the government pointed out, J.A. 420-422, President Truman was not a legislator and did not specifically criticize § 1326 (instead focusing on the quota system). But if nothing else, Congress's decision to override his veto shows an indifference to the concerns he cited—and which were present in the illegal reentry provision as well. *See Carillo-Lopez*, 555 F. Supp. 3d at 1013.

49

Third, Deputy Attorney General Peyton Ford wrote to Senator McCarren (sponsor of the act and chairman of the Judiciary Committee) with the views of the Department of Justice. Ford supported the bill and approved of changes that would make it more punitive or that would "overcome the inadequacies in the existing law." J.A. 379. In his letter, Ford used the derogatory slur "wetback" and noted that parts of the bill would help solve the "wetback problem." *See* J.A. 381; *Carillo-Lopez*, 555 F. Supp. 3d at 1013-14. The government took great effort in the district court to downplay this statement, J.A. 422-425, but its attempts at hair-splitting are unpersuasive. Again, the Deputy Attorney General was not a legislator, but his use of this term, without apology or hesitation and without any apparent pushback from Congress, evinces a general climate of racial stereotypes and animus surrounding the passage of the 1952 INA. *Carillo-Lopez*, 555 F. Supp. 3d at 1014-15.

Around the same time, just a few months before the INA passed, Congress passed Senate Bill 1851, nicknamed the "Wetback Bill." *See Carrillo-Lopez*, 555 F. Supp. 3d at 1015 (citing United Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952)). The debate around this bill was also replete with casual usage of derogatory slurs against Mexicans and other Latin Americans. The bill, an anti-harboring provision, was designed to "limit the number of Mexican immigrants and the trafficking of undocumented Mexican immigrants into the United States." *Id.* at 1016. But notably, the law did not punish the employers who hired them. *Id.* at

1015-16.  Again, the history of the "Wetback Bill" highlights the milieu in which the INA was enacted, and which Congress did nothing to repudiate.  *Id.* at 1016.

Finally, the Court can consider "Congress' silence in light of their knowledge that Section 1326 disparately impacts Latinx people as further evidence of continued racial animus."  *Id.*  As noted above, in the years following the passage of the 1929 illegal reentry statute, the government brought tens of thousands of prosecutions, the vast majority against Hispanic individuals.  Yet in the face of this racially disparate impact from the earlier law, and despite President Truman's criticism of various aspect of the immigration system, Congress chose to reenact the law.  "Congress' silence about the prior racist iterations of this bill coupled with its decision to expand the grounds for deportation and carceral punishment, despite its knowledge of the disparate impact of this provision on Mexican and Latinx people, is some evidence that racial animus was a motivating factor."  *Id.* at 1016-17.

In sum, "[t]he totality of evidence shows that the same factors motivating the passage of Section 1326 in 1929 were present in 1952."  *Carrillo-Lopez*, 555 F. Supp. 3d at 1017.  Even if this Court were to ignore the substantial evidence of racial animus motivating the passage of the 1929 illegal reentry law, the 1952 law suffers from the same constitutional infirmity.

51

\*     \*     \*

The Congress that passed the 1952 INA did not confront at all—let alone meaningfully address—the discriminatory history of the 1929 Act. Because Congress merely reenacted the law without making substantive changes, the history and surrounding circumstances of the prior law carry forward and remain embedded into the fiber of the 1952 version. This Court can and should consider the history of the 1929 Act. Even considered on its own, however, the 1952 INA itself was passed with the same animus-based purpose and distinctly harsh impact.

Congress has the power to enact a law against unauthorized border crossings. But it must do so consistent with the Constitution's promise of equal protection under the law. What Congress has done instead is to pass an illegal reentry law with a discriminatory motivation and a disparate effect on Hispanic people. As a result, 8 U.S.C. § 1326 is unconstitutional.

## <u>CONCLUSION</u>

For these reasons, this Court should vacate Mr. Alvarez Rodriguez's conviction and remand the case to the district court with instructions to dismiss the indictment.

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia

_____s/  Patrick L. Bryant_____
Patrick L. Bryant
Appellate Attorney
Cadence A. Mertz
Assistant Federal Public Defender
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Patrick_Bryant@fd.org
Cadence_Mertz@fd.org

Julie K. Linnen
Assistant Federal Public Defender
150 Boush Street, Suite 403
Norfolk, VA 23510
(757) 457-0800
Julie_Linnen@fd.org

November 21, 2022

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

In its order removing this case from abeyance and directing supplemental briefing, the Court indicated that this appeal would be argued in seriatim with No. 22-4072(L), *United States v. Sanchez-Garcia*. *See* Doc. 18 (Aug. 17, 2022). Counsel for Appellant agree that the issues presented in this appeal may be more fully developed through oral argument, and stand ready to present that argument on behalf of Mr. Alvarez Rodriguez.

# <u>CERTIFICATE OF COMPLIANCE</u>

1.    This Brief of the Appellant has been prepared using WordPerfect 2021 software, Times New Roman font, 14-point proportional type size.

2.    EXCLUSIVE of the table of contents, table of authorities, signature block, statement with respect to oral argument, and this certificate of service, this brief contains no more than 13,000 words, specifically 12,008 words.


I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.


    November 21, 2022                          s/  Patrick L. Bryant           
            Date                                Patrick L. Bryant
                                       Appellate Attorney